UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.: 0:18-cv-60704 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL L. MEYER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

The United States alleges as set forth below.

**NATURE OF THE ACTION**

1.      From 1999 to the present, Michael L. Meyer ("Meyer") has organized, promoted, and operated an elaborate—and bogus—charitable giving tax scheme throughout the United States. Through this scheme, Meyer creates an entity for each scheme participant and advises them to transfer assets to the new entity. Meyer then causes the participants to purportedly "donate" or "assign" an interest in these entities to charities that Meyer controls. Meyer then "appraises" the purportedly donated interests in a manner that fails to comply with the law and generally accepted appraisal standards. Finally, Meyer prepares the federal income tax return documents to claim the bogus charitable contribution deductions.

2.      This entire tax scheme occurs only on paper. Participants never actually transfer or donate anything to Meyer's purported charities. In some egregious instances, participants claim bogus charitable deductions for nonexistent, fictional assets that Meyer fabricates.

3.      Regardless of the purported form, Meyer advises scheme participants to take unwarranted tax deductions for charitable donations that Meyer knows were never made, and, in

some instances, for assets that did not exist. Meyer sells this scheme to the clients of financial planners and Certified Public Accountants by misrepresenting his experience, his credentials, and the merits of his charitable giving tax scheme. In return, scheme participants pay substantial fees to Meyer based on the purported value of the assets initially transferred to the entities.

4.     Meyer's charitable giving tax scheme has harmed the United States by depriving the government of tax revenue. The IRS has identified specific transactions that, through 2014, cost the United States Treasury more than $35 million in lost tax revenue. And while the IRS has assessed and will continue to assess scheme participants with significant tax liabilities, it will likely never fully recover the monies Meyer bilked from the Treasury.

5.     The United States brings this Complaint pursuant to 26 U.S.C. §§ 7402, 7407, and 7408 to enjoin Meyer and all persons and entities in active concert or participation with Meyer from, among other things, directly or indirectly:

     a.  Making or furnishing or causing another person to make or furnish a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit, or otherwise providing tax advice, in exchange for compensation;

     b.  Preparing (or assisting others in preparing) appraisals in connection with any federal tax matter;

     c.  Acting as federal tax return preparers, or filing, assisting in, or directing the preparation or filing of federal tax returns, amended returns, or other related documents or forms for any person or entity other than his own tax returns; and

     d.  Organizing or assisting in the organization of a partnership or other entity, any

investment plan or arrangement, or any other plan or arrangement concerning

charitable contribution deductions.

The United States also seeks to disgorge the ill-gotten gains that Meyer derived from this bogus

charitable giving tax scheme.

## JURISDICTION AND VENUE

6.      This action for injunctive relief and disgorgement is brought at the request of a

delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the

Attorney General of the United States.

7.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345, and 26

U.S.C. (Internal Revenue Code) §§ 7402(a), 7407, and 7408.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 26 U.S.C. §

7408(a) because Meyer resides in this district and because a substantial part of the actions giving

rise to this suit took place here.

## DEFENDANT

9.      Meyer resides at 16850 Stratford Court, Southwest Ranches, Florida 33331. The

Court has personal jurisdiction over Meyer because he resides in this judicial district and a

substantial part of the actions giving rise to this suit took place in this judicial district.

## OVERVIEW OF THE CHARITABLE GIVING TAX SCHEME

10.     From 1999 to the present, Meyer has promoted an abusive tax scheme that results

in scheme participants claiming unwarranted federal income tax deductions for bogus charitable

contributions.

11.     Meyer markets his scheme nationwide through financial planners and Certified

Public Accountants ("CPAs"). Meyer pays some of these financial planners and CPAs for their

referrals. Meyer testified that he sells this scheme through financial planners and CPAs because

their clients are Meyer's "target market"—*i.e.*, wealthy individuals in high tax brackets facing large tax liabilities.

12. Meyer has promoted his scheme using different terminology, including "The Ultimate Plan," and "The Ultimate Tax Plan." Whatever the nomenclature, the mechanics of the scheme are substantially the same.

13. In general, an individual taxpayer who makes qualifying charitable contributions during a tax year may deduct the fair market value of those donations from his income. This deduction reduces the taxpayer's tax liability. The maximum deduction permitted by the Internal Revenue Code is 50% of a taxpayer's income—specifically, his "adjusted gross income"—when the donation is made to a public charity.

14. Using Meyer's scheme, individual scheme participants claim hundreds of thousands of dollars, and sometimes millions of dollars, in unwarranted charitable contributions that allow them to deduct 50% or close to 50% of their adjusted gross income each tax year. Some deductions were so large that the participants could not use the entire deduction in one tax year, and, therefore, carried the unused bogus deductions forward to future tax years.

**Meyer's Bogus Charities**

15. Since 1999, Meyer has established at least three purported charities in Indiana: (1) National Endowment Association, Inc. ("NEA"); (2) Grace Heritage Corporation ("Grace Heritage"); and (3) Indiana Endowment Fund, Inc. ("IEF") (collectively, the "Bogus Charities"). Meyer controlled all three purported charities and operated them in the same manner.

16. According to their respective Articles of Incorporation, the Bogus Charities were purportedly organized for charitable purposes. Meyer submitted a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Tax Exempt

Status Application"), on behalf of each of the Bogus Charities. The IRS granted the Bogus

Charities tax exempt status based on the Tax Exempt Status Applications that Meyer submitted.

17.     Over the years, Meyer is listed on documents filed with the Indiana Secretary of

State's Office as an officer, treasurer, director, incorporator, or registered agent for the Bogus

Charities. Meyer has also attempted to avoid IRS scrutiny by affiliating his parents or other

individuals with the Bogus Charities on filings with the Indiana Secretary of State's Office. At

all times, however, Meyer controlled the Bogus Charities and was the only true officer and

director. The Bogus Charities had no employees.

18.     On May 16, 2014, Meyer executed an agreement with the IRS on behalf of NEA

retroactively revoking NEA's tax exempt status as of January 1, 2005. The IRS concluded, and

Meyer did not dispute, that NEA was not engaged primarily in activities for exempt purposes,

and its net earnings inured to the benefit of private individuals—*i.e.*, him and his family.

19.     On June 5, 2014, Meyer, on behalf of NEA, stipulated to an entry of judgment

against it in U.S. Tax Court for past due taxes for 2005 and 2006. NEA owed taxes on its income

because it was not a tax exempt entity.

20.     On May 19, 2017, Meyer executed agreements with the IRS on behalf of Grace

Heritage and IEF retroactively revoking Grace Heritage and IEF's tax exempt status as of

January 1, 2010 and January 1, 2011, respectively, because Meyer used Grace Heritage and IEF

as tools for promoting, organizing, and executing his charitable giving tax scheme.

**Meyer's Bogus Charitable "Transactions"**

21.     Under the first step in Meyer's scheme, Meyer creates a partnership or limited

liability company (the "Entity" or "Entities") for scheme participants. Regardless of their form,

the Entities are holding companies that exist solely to facilitate Meyer's scheme. Meyer prepares

and files all paperwork necessary to create the Entities, including the partnership or LLC agreements.

22.     Next, the scheme participants transfer "property" to the newly formed Entities using contractual documents prepared by Meyer. Some participants, at Meyer's direction, claim to transfer cash or real property to the Entities while others purportedly transfer backdated promissory notes and fabricated intellectual property. Over time, Meyer varied how he executed this scheme step, but the variations were meaningless from both economic and federal income tax perspectives.

23.     Meyer then drafts the paperwork necessary to cause the scheme participants to "donate" or "assign" an interest in the newly-created Entities to one of the three Bogus Charities.

24.     Some participants purport to donate a 99% non-controlling interest in their Entity, while others a 100% interest. In some cases, Meyer misrepresents the "transaction" to the participants, telling such participants that they were "contributing" a 99% non-controlling interest, when, in fact, Meyer completed the transactional paperwork to show a 100% "contribution."

25.     Meyer then causes the Bogus Charities to send contemporaneous written acknowledgments of the purported contributions to the scheme participants.

26.     Meyer appraises each "contribution" to facilitate the bogus charitable deductions. Not only are the appraisals baseless, but Meyer is prohibited by law from providing them.

27.     Meyer completes, signs, and provides to each scheme participant IRS Forms 8283, Noncash Charitable Contributions ("Form 8283"), which are necessary to claim a non-cash charitable contribution of more than $5,000. Meyer sends the scheme participants the following instructions: "Please find IRS Form 8283 which has been completed and signed. Please attach

the Form 8283 with your [tax year] Form 1040. After you have done this, then simply file the Return. . . . Use the value of the gift on Form 8283 (page 2 Part I) as a DEDUCTION on SCHEDULE A – ITEMIZED DEDUCTION – CHARITABLE CONTRIBUTION."

28.     In following Meyer's instructions, the scheme participants then attach the Meyer-prepared Form 8283 to their personal federal income tax returns to claim unwarranted charitable deductions. The Forms 8283 are based entirely on the bogus appraisals that Meyer prepares to facilitate this scheme.

29.     On paper, it appears that the participants donate something of value to the Bogus Charities. Meyer repeatedly advises the scheme participants to take actions to give his scheme substance. This was mere window dressing, however, designed to disguise Meyer's tax shelter. In reality, the scheme participants retain complete control over their Entities and their Entities' assets and continue to use the purportedly donated assets as if nothing ever happened.

30.     After executing the "transaction," the Bogus Charities do not take dominion or control over the Entities or their assets. The Bogus Charities are simply vehicles through which Meyer executes his elaborate charitable giving tax scheme.

**Meyer's Role**

31.     Meyer is the architect of this charitable giving tax scheme. He promotes, organizes, and executes every material aspect of the scheme that gives rise to the participants' bogus charitable deductions—from the creation of the Bogus Charities and the incorporation of Entities to the drafting of "transactional" documents, the appraisal of the Entities, and the completion of the necessary tax return documents.

32.     Meyer executes an "Attorney Engagement Agreement" with each participant that outlines his expansive role in every aspect of this abusive tax scheme. The agreement states that

Meyer shall form an Entity for the participant, secure tax identification numbers for the Entity, draft all documents necessary to transfer assets to the Entity, file all necessary paperwork with state and local authorities, prepare all documents necessary to facilitate the "charitable gift," and engage a "qualified appraiser" to value the purported charitable contribution. Meyer also agrees to represent scheme participants before the IRS or in Tax Court if the participants' tax returns are audited.

33.     Indeed, in a 2016 deposition of Meyer, Meyer described his role as follows: "[M]y role was to draft the legal documents, get the tax ID numbers, you know, make sure that the assets were transferred over the partnership, prepare the appraisal, the valuation, which the client would then use to – as the basis upon which to deduct, receive a charitable deduction, administer the plan, do the annual tax filings . . . [a]nd then if need be, if the plan was ever audited that I would represent the client as well without charge based on what the initial setup was."

34.     Meyer profits from his scheme by charging a percentage fee based on the value of the purportedly donated assets. His standard fee is "6% of net assets transferred [to the Bogus Charities] up to but not in excess of $1,000,000, plus 4% of net assets transferred which exceed $1,000,000."

35.     Meyer also charges participants an annual administration fee of $2,500 for the preparation of state and federal tax return filings for the Entities each year. However, many of the Entities do not file income tax returns.

36.     The Bogus Charities are Meyer's personal piggy bank. Meyer deposits some of his fees into the Bogus Charities' bank accounts to both hide his personal income from the IRS and to pay referral fees to the financial planners and CPAs whose clients participate in this

scheme. Meyer told a banker that the Bogus Charities' money is really his and that Meyer was "simply using the entity for [Meyer's] own tax and creditor planning purposes." In addition, Meyer and his family members received personal loans from the Bogus Charities, and Meyer used NEA's assets as collateral to purchase a home for his ex-wife and a Lamborghini for himself.

37.     Meyer knows that maintaining the appearance of legitimacy is critical for the scheme's success. For instance, Meyer told his ex-wife that he could not send her money because "[e]verything has been put in the Foundation. I cant [sic] get the money out of the Foundation or it may compromise everything I have attempted to build. With the IRS snooping around, I am really trapped right now. I cant [sic] get to the money."

**MEYER'S MISREPRESENTATIONS OF
THE CHARITABLE GIVING TAX SCHEME**

38.     To gain the trust of financial planners and CPAs and access to their clients, Meyer makes demonstrably false statements about his experience and credentials, the legality of his tax scheme, and the structure of the tax scheme.

**Meyer Misrepresents His Experience and Credentials**

39.     Meyer is a licensed attorney in Kentucky and Indiana.

40.     Meyer does not have a law office in Kentucky or Indiana.

41.     Meyer operates his legal practice from his Florida home.

42.     Meyer is not licensed to practice law in Florida.

43.     Meyer claims that he was the lead tax attorney for a major law firm's tax department of over two years, but he was not. The law firm Meyer worked for did not have a tax practice and Meyer was not a partner. It was his first job after law school.

44.     Meyer holds himself out as a CPA, but he is not. Meyer's CPA license expired in

2012.

45.    Meyer lists on his resume that he has six years of experience as a CPA, but he does not.

46.    Meyer holds himself out as a licensed Certified Valuation Analyst ("CVA"), but he is not.

**Meyer Induces Participation in His Scheme by Misrepresenting Its Legality**

47.    Meyer knowingly made a false statement every time he told financial planners and potential participants that his scheme was legitimate and valid under the tax laws.

48.    Over the years, Meyer used various slide decks to explain the transaction to potential participants. One slide states, "Does it sound too good to be true??? We have total legal authority." Various legal authorities are provided, but Meyer knows that none of them support the legality of his charitable giving tax scheme.

49.    Meyer provided potential participants a "Gift of LP/LLC Interest To Charity" legal memorandum and a tax opinion, both of which purported to opine on the validity of Meyer's scheme. These marketed opinions violated the professional obligations set forth in Treasury Department Circular No. 230, Regulations Governing Practice before the Internal Revenue Service ("Circular 230"), because they made unreasonable assumptions and failed to address critical facts. For example, the "Gift of LP/LLC Interest To Charity" legal memorandum analyzes various factors to determine whether a contribution has been made, but ignores the fact that Bogus Charities never actually take control of the purportedly donated Entity interests, as Meyer knows. Additionally, these marketed opinions failed to include key warnings and legends that Circular 230 required.

50.     Meyer also provided potential participants copies of "no-change" audit reports and related audit correspondence to prove the scheme's validity. The IRS issues a "no-change" audit report when a revenue agent audits a taxpayer's return and does not challenge, for whatever reason, the taxpayer's treatment of the item(s) being audited. During the time in which Meyer has promoted this abusive tax scheme, the IRS has audited and not disallowed charitable contribution deductions claimed by some scheme participants. Nonetheless, Meyer's use of the "no-change" audit reports and related correspondence was both a false statement and improper. First, an audit report is not an IRS ruling or its official position, and cannot be relied on as such. Promoting no-change audits in this manner is a false statement. Second, for all the reasons alleged in this Complaint, Meyer knew that the scheme was not legitimate. The no-change audit reports did not change reality. Third, in at least one instance, Meyer violated his confidentiality obligations as a lawyer, a purportedly licensed CPA, and under the Internal Revenue Code, when he shared one participant's audit examination correspondence to other scheme participants without first obtaining the requisite consent.

51.     In a February 27, 2015 email, Meyer told a financial adviser that two civil suits between him and two participants were "pretty much the only legal issues [he had] in 17 years with this plan." Meyer knew this was a false statement. Meyer claimed that one of the lawsuits "settled peacefully" after Meyer was deposed, but he failed to disclose in his email that the case "settled peacefully" because Meyer paid the participant $85,000. Meyer also failed to disclose in his email at least three other settlement payments that he made in 2014 alone for $100,000, $55,000, and $20,000.

52.     In his February 27, 2015 email, Meyer also failed to disclose that, on behalf of NEA, he signed an agreement with the IRS in May 2014 that retroactively revoked NEA's tax

exempt status as of January 1, 2005.

53.     In his February 27, 2015 email, Meyer also failed to disclose 22 fully litigated

Tax Court cases involving purported donations to NEA. In each instance, the IRS audited and

disallowed the tax benefits derived from Meyer's scheme, and the scheme participant sought a

redetermination of the IRS's decision in Tax Court. However, each case ended with a stipulated

decision in which the scheme participant conceded that the tax benefits associated with Meyer's

scheme should be disallowed. Meyer knew of this litigation because either he or one of his "team

members" was the attorney of record in 18 of these 22 cases. Nonetheless, Meyer failed to

disclose all of these "legal issues" in his February 27, 2015 email.

### Meyer Misrepresents the Structure of His Tax Scheme by Advising Others that He Establishes Donor Advised Funds

54.     Meyer told potential participants that they could establish Donor Advised Funds

("DAFs") through the Bogus Charities, but this was a false statement.

55.     The Internal Revenue Code defines DAFs as a fund or account "(i) which is

separately identified by reference to contributions of a donor or donors, (ii) which is owned and

controlled by a sponsoring organization, and (iii) with respect to which a donor . . . has . . .

advisory privileges with respect to the distribution or investment of amounts held in such fund or

account by reason of the donor's status as a donor."

56.     DAFs are not standalone entities. Each DAF is established by a sponsoring

organization, which must be an Internal Revenue Code § 501(c)(3) tax exempt organization. The

sponsoring organization creates a separate DAF for each donor. The donor then makes a tax

deductible charitable contribution to the donor's DAF. The donor cannot use or otherwise access

the donated property because the sponsoring organization maintains complete control over the

DAF and its property. The donor retains "advisory privileges" regarding future DAF

distributions, but the sponsoring organization is not required to honor the donor's requests and may only distribute DAF property to other Code § 501(c)(3) tax exempt entities. After a donor makes a distribution request to a DAF, the DAF will make a distribution from the assets that the DAF controls after performing due diligence to ensure the intended recipient is a qualified charity.

57.     By advising potential participants that they could establish DAFs through the Bogus Charities, Meyer misrepresented the structure of his illegal tax shelter. The Bogus Charities did not qualify or operate as sponsoring organizations, and the Entities Meyer established did not qualify or operate as DAFs.

58.     To be a sponsoring organization, the Bogus Charities were required to inform the IRS that they intended to be sponsoring organizations on their Tax Exempt Status Applications. They did not. To be a sponsoring organization, the Bogus Charities were also required to describe its DAF program and the written materials provided to donors on the Tax Exempt Status Applications. They did not.

59.     To be a sponsoring organization, the Bogus Charities were required to report certain information on the annual "tax return" for tax exempt entities—Form 990, Return of Organization Exempt from Tax ("Form 990"). They did not. Indeed, on the Forms 990, Part IV, Question 6, Meyer stated that the Bogus Charities did not "maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts."

60.     Meyer completed the Bogus Charities' Tax Exempt Status Applications and Forms 990 and knew that the Bogus Charities did not report the required information to be a lawful sponsoring organization. Therefore, Meyer knew that the Bogus Charities were not

sponsoring organizations.

61.    To establish a DAF, the Bogus Charities were required to take control of the purportedly contributed Entity interests. As explained throughout this Complaint, the scheme participants never gave up control of the purportedly contributed assets, which Meyer knew. If scheme participants actually wanted to make a donation to a charity through a Bogus Charity—which many participants did not do—Meyer required them to send to him a "Disbursement Request Form" along with a check made out to one of the Bogus Charities. These "Disbursement Request Forms" merely gave the appearance of a valid DAF, but a valid DAF would never have required an additional check from the participant. This process shows that the Bogus Charities never had dominion or control over any of the purported contributions.

62.    Meyer made a false statement every time that he told a scheme participant that the participant could create a valid DAF through the Bogus Charities. Meyer knew these were false statements because Meyer knew that he never established the Bogus Charities as valid sponsoring organizations and the Entities as valid DAFs.

**MEYER'S CHARITABLE GIVING TAX SCHEME
FLAGRANTLY VIOLATES THE INTERNAL REVENUE LAWS**

63.    The Internal Revenue Code allows individual taxpayers to deduct any charitable contribution made during a taxable year. "Charitable contribution" is defined, as relevant here, as a "contribution or gift" to a tax exempt corporation. A taxpayer may deduct only those charitable contributions "actually paid during the taxable year," and the maximum deduction permitted is 50% of a taxpayer's income—specifically, his "adjusted gross income"—when the donation is made to a public charity.

64.    A contribution is not deductible unless it constitutes a completed gift. This means that the donor must completely relinquish "dominion and control" over the contributed property

and may not retain any right to direct the disposition or manner of enjoyment of the subject of the gift.

65.    The scheme participant's purported charitable contributions to the Bogus Charities were not valid contributions for federal income tax purposes.

66.    Scheme participants never relinquish dominion or control over the Entities that Meyer establishes for them. Scheme participants continue to control the assets or property that they used to "fund" the Entities.

67.    Some participants in Meyer's tax scheme, upon Meyer's advice and with his assistance, have taken out substantial loans from their respective Entities even after transferring their ownership interest to one of the Bogus Charities. These loans are made on beneficial terms and sometimes go unpaid. Meyer testified in a 2016 deposition that most participants borrowed their Entities' assets or used the assets as collateral for some other purpose.

68.    Consequently, participants in Meyer's scheme receive a large income tax deduction and still get the use and enjoyment of the assets that generated the deduction.

69.    Meyer knew or should have known that scheme participants could not claim charitable contribution deductions for engaging in the transaction because he knew, as the Bogus Charities' only director, officer, and employee, that the Bogus Charities never exercised dominion and control over the purportedly donated property.

70.    Meyer made a false statement every time he represented to others that participants could deduct any purported amount of this "transaction" as a charitable contribution.

71.    Meyer made a false statement every time he prepared IRS Forms 8283 for participants that showed a charitable contribution made as a result of this "transaction."

72.     Meyer made a false statement every time he prepared a Form 990, Return of Organization Exempt From Income Tax, for the Bogus Charities because each Form 990 reflects contribution income, and Meyer knew that the Bogus Charities never received anything.

**Meyer Advises Participants to Improperly Deduct Pledges or Promises to Pay**

73.     Generally, a taxpayer may only claim a charitable deduction for payments and other completed gifts made to qualified charities during the tax year. A taxpayer may not deduct amounts pledged to charity, but not paid during the tax year. Similarly, executing a promissory note in favor of a charity is a mere promise to pay. It is not a completed gift and does not create a valid charitable deduction until paid.

74.     Meyer drafts promissory notes for many of the scheme participants. Meyer advises participants to transfer the promissory notes to their respective Entities. Meyer encourages the use of promissory notes to inflate the purported appraised value of the Entities' interests, which, in turn, inflates the amount of the charitable contribution the participants claim and the fees Meyer receives.

75.     Meyer instructs scheme participants to pay off the note within one year to give it "substance." Because the participants do not surrender control of their Entities or their assets to the Bogus Charities, paying the note simply moves money from a participant's right pocket to the left. The transaction is bogus.

76.     The promissory notes that Meyer uses in this scheme are window dressing that he uses to generate fraudulent charitable deductions for the participants and more profits for himself. Meyer knows that telling participants to take charitable deductions for promissory notes are false statements because promises to pay do not create valid charitable deductions, and, moreover, the promissory notes that he creates have no substance.

16

**Meyer Advises Participants to Unlawfully Backdate Documents**

77.     Meyer backdates documents, including engagement letters, promissory notes, assignments, and appraisals to allow scheme participants to claim charitable deductions for taxable years that had already closed.

78.     Meyer uses existing Entities and figuratively pulls them off his shelf whenever an individual seeks to participate in his tax scheme. He then backdates documents to give the appearance that participants owned those Entities and contributed those Entities' interests to the Bogus Charities in previous tax years.

79.     Meyer knows that backdating documents to obtain unwarranted tax benefits is fraudulent and illegal.

80.     Meyer also knows that advising participants to claim charitable deductions for backdated contributions are false statements. In such instances, Meyer knows that no gifts were made during the tax year, thus precluding charitable deductions.

(*Remainder of page intentionally left blank.*)

81.     For instance, Meyer wrote the following email in response to a financial planner's inquiry on January 15, 2015, in which Meyer described how a participant could claim a charitable contribution for tax year 2014 despite the fact that the participant had not engaged in the "transaction" yet. "CLLC" means Charitable Limited Liability Company, which is how Meyer, in some instances, described the scheme.

---

**CLLC Deductions for 2014**

Michael Meyer <char███████████████                                    Thu, Jan 15, 2015 at 11:34 AM
Reply-To: Michael Meyer <char███████████████
To: ███████████████
Cc: ███████████████

████: Thx.  Pray you are blessed as well.

I have an LLC from 2014 that is set up.  Client will contribute a note dated 12/31/14 to the LLC just like ██████ did.  He can deduct up to 50%.  He can deduct up to 50% max of AGI.  So, if he has $800K AGI, then he can deduct $400K max.  He would need a note of $500K to get a deduction of $400K.

We can get the deduction in 2014.  Just like for ████████, he will need to pay off the note this year to give the note substance.

Let me know if you have questions. Thx.  Mike..

---

From: ███████████████████
To: Michael Meyer <char██████████████
Cc: ██████████████████
Sent: Wednesday, January 14, 2015 9:43 PM
Subject: CLLC Deductions for 2014

Hey Mike,

We have a client who wants to know if it's too late to do a CLLC for 2014, as he's still looking at around $800k in AGI even after other planning. I suspected it was too late, but thought I'd ask you anyway to confirm. Let me know your thoughts.

I hope you and your family enjoyed the holidays and new year. Looking forward to working more deals together in 2015!

---

82.     Meyer's January 15, 2015 email contained at least four statements that Meyer knows are false. First, backdating documents to obtain unwarranted tax benefits is illegal and does not create a valid charitable deduction. Second, Meyer told the financial planner that the participant can take a charitable deduction for executing a note (*i.e.*, a pledge), which is prohibited by the Internal Revenue Code. Third, paying the backdated note does not give

Meyer's scheme "substance." Meyer's scheme as a whole and his bogus promissory notes lack substance. Fourth, as fully explained below, Meyer "appraises" the purported donations by using a predetermined discount, which is nothing more than window dressing to disguise this tax shelter from the IRS. Meyer's claim that a $500,000 promissory note's fair market value is automatically $400,000 is a false statement because his 20% discount is baseless, and, more importantly, there would never be an actual charitable donation.

### The Scheme Participants' Purported Charitable Deductions
### Rely on Bogus Appraisals Performed by Meyer

83.     Meyer uses bogus appraisals to generate illicit profits for himself and improper charitable contribution deductions for scheme participants.

84.     The Internal Revenue Code sets forth a number of requirements that must be met before a taxpayer can claim a charitable contribution deduction. The level of substantiation required of taxpayers who claim a charitable contribution deduction varies depending on the amount of the claim deduction. If a taxpayer intends to claim a non-cash charitable contribution of over $5,000 on his tax return, then he must obtain a "qualified appraisal" of the asset from a "qualified appraiser" as defined by the Internal Revenue Code and the regulations thereunder.

85.     Because each of Meyer's scheme participants claimed non-cash charitable contributions of over $5,000 on their tax returns based on the purported donation of their Entity interests to the Bogus Charities, they were required to obtain "qualified appraisals" of the purportedly donated Entity interests from "qualified appraisers."

86.     As noted above, Meyer executes an Attorney Engagement Agreement with each scheme participant in which Meyer agrees to engage a "qualified appraiser" to obtain a "qualified appraisal" of their respective Entity's interests that they "gift" to charity.

87.     In reality, Meyer performs the appraisals for the scheme participants.

88.     Meyer does not tell scheme participants that he is the appraiser prior to performing the appraisals.

89.     Meyer claims that he "implemented and consulted on over 600 charitable plans in 25 States encompassing $600M since 1998 [and] performed over 500 qualified appraisals of closely-held businesses since 2001."

90.     The appraisals Meyer uses in his tax scheme are bogus because Meyer is excluded by law from preparing appraisals in connection with this scheme, the appraisals are not "qualified appraisals" within the definition of the Internal Revenue Code, and the appraisals are based on unreliable methods.

*Meyer Is Excluded by Law from Preparing Appraisals*
*for Property "Donated" to the Bogus Charities*

91.     The appraisals each scheme participant received were not performed by a "qualified appraiser."

92.     Meyer is not a "qualified appraiser."

93.     A "qualified appraiser" must meet certain education and experience requirements and must regularly prepare appraisals for compensation. A "qualified appraiser" must be "qualified to make appraisals of the type of property being valued" and—importantly—must not be excluded under the applicable Treasury Regulations.

94.     The Treasury Regulations specify the following persons who cannot serve as "qualified appraisers" with respect to particular property: (a) a party to the transaction in which the donor acquired the property being appraised, or any person who acted as an agent for the donor with respect to such sale; (b) any person employed by the donor; (c) any person employed by the donee or who otherwise controls the donee; or (d) an appraiser who is regularly used by

the donee and does not perform a majority of his or her appraisals during the year for other persons.

95.     Meyer is not a qualified appraiser because he is an agent to the transaction in which the donor acquires the property being appraised. Meyer created the Entity interests that the participants purported to contribute to the Bogus Charities. Meyer drafted the documents necessary to transfer assets or property to scheme participants' Entities and to "gift" the Entities' interests to the Bogus Charities. Meyer then appraised the Entities' interests as their agent pursuant to a standard engagement letter.

96.     Meyer is not a qualified appraiser because he was employed by the donors—*i.e.*, the scheme participants—through a standard engagement letter.

97.     Meyer is not a qualified appraiser because he is the donees'—*i.e.*, the Bogus Charities'—only true director and officer. The Bogus Charities had no employees.

98.     Meyer is not a qualified appraiser because he is the only appraiser the donees—*i.e.*, the Bogus Charities—use, and Meyer prepares the majority of his appraisals for them.

99.     To constitute an appraisal performed by a "qualified appraiser," the Treasury Regulations also require the appraisal to include a declaration from the individual on the appraisal summary that sets forth that: (a) the individual holds himself out to the public as an appraiser or performs appraisals on a regular basis; (b) the individual is qualified to make appraisals of the type of property being valued because of his or her qualifications; (c) the individual is not excluded from serving as a qualified appraiser; and (d) the individual understands that an intentionally false or fraudulent overstatement of the value for the property may subject the appraiser to a civil penalty.

100.    Meyer is not a qualified appraiser because he does not include a declaration that sets forth the information described above with his appraisals.

*Meyer's Appraisals Do Not Constitute Qualified Appraisals*

101.    An appraisal is a "qualified appraisal" if it meets certain criteria prescribed by the applicable Treasury Regulations and is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards."

102.    To constitute a "qualified appraisal," the Treasury Requirements mandate that an appraisal document be prepared by a qualified appraiser and include certain information in the appraisal, such as a detailed description of the property being appraised and the physical condition of the property.

103.    An appraisal is not a "qualified appraisal" if the fee arrangement is based, in effect, on a percentage (or set of percentages) of the appraised value of the property. Contingency fees are also explicitly prohibited under Circular 230 and generally accepted appraisal standards.

104.    Meyer's appraisals are not qualified appraisals because Meyer is not a qualified appraiser.

105.    Meyer's appraisals are not qualified appraisals because his fee is based, in effect, on a percentage of the appraised value of the property. As discussed above, Meyer causes the participants to purportedly contribute an asset(s) to an Entity. Meyer assigns, without explanation, a value to the asset(s). He then applies his bogus, predetermined discounts to arrive at a purported contribution amount. Thus, in effect, and at least in part, Meyer's 4% - 6% fee is based on the appraised value of the property.

106.    In addition, Meyer's fee arrangement violates Circular 230 and the American

Institute of Certified Public Accountants' prohibitions on contingent fees, and creates a reportable transaction with contractual protection that he and the participants were required, but failed to disclose to the IRS. As discussed above, Meyer causes the participants to "contribute" an asset to an Entity and then "donate" an interest in the Entity to a Bogus Charity to generate an unwarranted charitable deduction. Meyer's 4% - 6% fee results in an impermissible continent fee of 20% - 31% of the tax benefit sought, taking into account Meyer's predetermined, bogus discounts and an assumed tax rate of 25%.

*Meyer Uses Unreliable Methods to Appraise the "Donated" Property*

107.    Meyer's appraisals are unreliable and not credible.

108.    The amount of any charitable contribution deduction is generally based upon the fair market value of the property at the time of the donation. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

109.    Meyer utilizes a number of improper methods in appraising interests in Entities that scheme participants purportedly donate to the Bogus Charities, which result in grossly overvalued appraisals and, in turn, grossly overstated tax deductions.

110.    As evidenced by Meyer's January 15, 2015 email above in paragraph 81, Meyer uses a predetermined discount to value every participant's purported Entity interest donation, regardless of whether the Entity's asset was cash, real property, a promissory note, or intellectual property. ("He would need a note of $500k to get a deduction of $400k.")

111.    By way of another example, the e-mail chain below shows that financial planners knew of Meyer's predetermined discount that he used in his appraisals for this scheme, and they

provided Meyer after the close of the year with an amount needed to maximize the participant's

charitable deduction:

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, April 18, 2016 5:59 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject: Re:** ▮▮▮▮LLC Promissory Note 2015-12-31

▮▮▮▮▮▮

Updated 8283 and Appraisal attached. We'll be in touch with the invoice for the additional amount.

On Fri, Apr 15, 2016 at 9:28 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

▮▮▮▮▮▮

Final signed 2015 Promissory Note attached for your records. Mike is working on the Appraisal and 8283 - should have sometime this weekend. The deduction will be 1,181,668 if ▮▮▮▮ s CPA needs the exact number.

On Fri, Apr 15, 2016 at 9:20 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

▮▮▮▮▮▮

Mike's discount is 21.3% per appraisal. So, in order to achieve a $1,181,668 deduction with cash contributed of $1,148,000, the note would need to be $361,155.

I'll send over the updated Note, 8283, and Appraisal once they're available.

***

On Thu, Apr 14, 2016 at 10:25 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

▮▮▮▮▮▮

I couldn't get in touch with the CPA tonight, so I actually have copies of all his returns and he did take a charitable deduction for $217,431 on his 2014 return. Thus it would mean you were correct about 2014 and the note.

So I was reviewing the final tax return for 2015 the CPA sent over his AGI is actually down a bit to $2,363,337. Which means I actually only need a total deduction of $1,181,668.50

If he has put in $1,148,000 that would mean he would have 80% deductibility which would mean $918,400 of deductibility so I need to get that up to $1,181,668.50

Thus I need $263,268 of deductibility. Thus $329,085 would be the Promissory Note. My apologies ▮▮▮▮!

     112.    After learning that the participant referenced above needed an appraised value of

$1,181,668.50, Meyer backdated an appraisal and Form 8283 to ensure this maximum charitable deduction and tax benefit.

113.    Meyer's opinions contained discounts for lack of control and lack of marketability. Generally, a discount for lack of control is appropriate when appraising a business interest that does not allow its owner to control the business—*e.g.*, a minority interest. A discount for lack of marketability is generally appropriate when there are barriers or obstacles to selling the asset being appraised.

114.    Meyer's appraisals generally concluded that a 10% discount for lack of control was appropriate. There was no basis for this conclusion. As described in paragraph 24 above, participants purportedly donated either a non-controlling interest in their Entities or a 100% interest in their Entities. Assuming *arguendo* that a non-controlling interest was actually donated, the 10% discount for lack of control was too low because a non-controlling interest gives the holder no ability to direct the business, compel dividends, control the board of directors, etc. A significantly larger discount would be required. Further, assuming *arguendo* that 100% of an Entity was actually donated, the 10% discount was too high and should have been 0% because a 100% ownership interest gives the owner complete control.

115.    Meyer's appraisals generally concluded that a 10% - 13% discount was appropriate for lack of marketability. There was no basis for this conclusion. In some situations, the discount should have been much higher. For instance, Meyer appraised some entities whose only assets were unsecured promissory notes that Meyer solely prepared to execute this scheme. The discount for lack of marketability should have been much higher because there is no established market for those assets. In other transactions where the appraised Entity's only asset was cash, the discount for lack of marketability should have been much lower because cash is

accepted everywhere and there are no significant barriers or obstacles to its use.

116.   Additionally, Meyer's appraisals relied on historic financial data of publicly traded financial funds to determine the "appropriate" discounts, but doing so was comparing apples to oranges. For example, when an Entity's only asset was a promissory note, Meyer should have determined the note's fair market value by analyzing whether such a note is available in the marketplace, while taking into account the debtor's income, assets, liabilities, and credit worthiness. Rather, Meyer arbitrarily relied on the financial data from incomparable financial funds. These comparisons make his discount determinations completely unreliable.

117.   Meyer's appraisals also failed to satisfy basic professional standards. For example, Meyer's appraisals generally failed to describe the documents he reviewed in completing his appraisal. The reason for this is simple: the scheme participants did not provide Meyer with information to support the appraisal because his scheme was a tax shelter.

118.   Most importantly, Meyer's appraisals failed to reflect the fact that the scheme participants retained control of the Entity interests that they purportedly donated. Therefore, the appraised values should have been $0 because nothing was given to the Bogus Charities.

**Meyer Prepares False Correspondence and IRS Forms
for Participants and the Bogus Charities**

119.   The federal tax laws require charities to provide donors with contemporaneous written acknowledgment of any charitable contribution of $250 or more. Meyer caused the Bogus Charities to send contemporaneous written acknowledgments to the scheme participants.

120.   The federal tax laws also require taxpayers to include a completed Form 8283, Noncash Charitable Contributions ("Form 8283"), with their federal income tax returns to claim a non-cash charitable contribution of more than of $500. When the donation is more than $5,000, Form 8283 requires appraisers to sign a declaration stating: "I declare that I am not the donor, the

donee, a party to the transaction in which the donor acquired the property, employed by, or related to any of the foregoing persons, or married to any person who is related to any of the foregoing persons. And, if regularly used by the donor, donee, or party to the transaction, I performed the majority of my appraisals during my tax year for other persons."

121.     All scheme participants claimed non-cash contributions of more than $5,000—*i.e.*, the Entity interests. Meyer completed and signed the Form 8283 for each of the participants, which Meyer based entirely on the bogus appraisals he prepared. Meyer often listed the following credentials on the Form 8283 after his signature: CPA, MBA, JD, CVA.

122.     For the reasons explained above, Meyer knew that the claimed charitable contributions and resulting appraisals were bogus. Therefore, when he based the Forms 8283 on those bogus appraisals, Meyer knowingly made false statements to and filed false documents with the IRS.

123.     For the reasons explained above, Meyer knowingly made a false statement by signing the appraiser declaration mentioned above because he knew he was a party to the transaction in which the donor acquired the property, was employed by the scheme participants, was an officer and director of the Bogus Charities, and did not perform the majority of his appraisals during the tax year for persons or entities other than Bogus Charities.

124.     For the reasons above, Meyer knowingly made false statements about his credentials on the Forms 8283.

125.     In addition, Meyer completed the Bogus Charities' Forms 990 and filed them with the IRS. On the Forms 990, Meyer represented that the Bogus Charities were legitimate tax exempt entities. Meyer also reported that the Bogus Charities received millions of dollars of donations every year. For example, Meyer reported on IEF's most recent Form 990 that IEF had

$134 million of assets under its control. These statements were false because Meyer knew that the scheme participants did not effectively transfer any assets or property to the Bogus Charities.

## EXAMPLES OF MEYER'S CHARITABLE GIVING TAX SCHEME

### *PARTICIPANT 1*

126.     Meyer sold his charitable giving tax scheme to Ohio-based PARTICIPANT 1 through PARTICIPANT 1's financial planner. PARTICIPANT 1 claimed a $211,410 charitable contribution deduction on his 2014 federal income tax return. Meyer charged $9,720 for PARTICIPANT 1 to participate in this scheme.

127.     PARTICIPANT 1 decided to participate in Meyer's charitable giving tax scheme in April 2015. Meyer used an existing LLC and illegally backdated *every document* he prepared for PARTICIPANT 1 so that PARTICIPANT 1 could claim a charitable deduction on his 2014 federal income tax return.

128.     On April 10, 2015, Meyer and PARTICIPANT 1 completed an LLC Agreement to transfer an LLC that Meyer had previous established in 2013 to PARTICIPANT 1. Meyer backdated the LLC Agreement to December 29, 2014.

129.     Then, Meyer drafted a promissory note through which PARTICIPANT 1 promised to pay his LLC $270,000. Meyer backdated the promissory note to December 31, 2014. The promissory note was not secured by any collateral and charged a 4% interest rate on outstanding balances in 2015 and 6% on any outstanding balances thereafter.

130.     Meyer also drafted an assignment agreement through which PARTICIPANT 1 purported to assign 100% of his LLC to IEF. Meyer backdated the assignment agreement as well to December 31, 2014.

131.     Despite executing the assignment agreement, PARTICIPANT 1 believed, based on Meyer's misrepresentations, that PARTICIPANT 1 only assigned a non-controlling LLC interest to IEF.

132.     On April 17, 2015, PARTICIPANT 1 opened a bank account in the LLC's name. PARTICIPANT 1 was the only person with signature authority over this account. PARTICIPANT 1 never gave Meyer or anyone at IEF control over the account.

133.     Later in 2015, PARTICIPANT 1 transferred $270,000 to the LLC's bank account to "repay" the bogus note's principal. PARTICIPANT 1 did not pay any interest.

134.     Meyer then prepared an appraisal report backdated to January 31, 2015—more than two months prior to the transfer of the LLC to PARTICIPANT 1—in which Meyer "appraised" PARTICIPANT 1's purported gift of LLC units to IEF at $211,410.

135.     Meyer's backdated appraisal does not describe or analyze the LLC's only asset—the promissory note. Rather, Meyer applied his standard 10% discount for lack of control, despite stating that IEF owned 100% of PARTICIPANT 1's LLC, and a 13% discount for lack of marketability. Meyer provided no meaningful explanation for these discounts.

136.     Meyer then prepared an IRS Form 8283 so that PARTICIPANT 1 could claim a $211,410 charitable contribution for the purported donation to IEF on his 2014 federal income tax return.

137.     The IRS audited PARTICIPANT 1's 2014 tax return and disallowed the $211,410 charitable contribution.

138.     In January 2017, after the IRS initiated the audit of PARTICIPANT 1's 2014 tax return, PARTICIPANT 1 made four charitable distributions totaling $11,000 to IEF. In order to

do so, PARTICIPANT 1 completed IEF's "Disbursement Request Form," but also sent a check to IEF in that amount.

139.    PARTICIPANT 1 retained an independent attorney to represent him in the IRS audit. In an email dated March 30, 2017, Meyer represented to the attorney that IEF was a "donor-advised organization" that was "100% legal." To the extent Meyer claimed in his e-mail that IEF or PARTICIPANT 1's LLC operated like a lawful DAF, that statement is false. If IEF were a valid DAF or sponsoring organization, it would have already been in control of the purportedly donated funds and PARTICIPANT 1 would not have needed to send a check to IEF. Instead, IEF did not have control over the purportedly donated funds.

### PARTICIPANT 2

140.    Meyer sold his charitable giving tax scheme to Boston-based PARTICIPANT 2 through PARTICIPANT 2's financial planner. PARTICIPANT 2 claimed charitable contribution deductions on his 2014 and 2015 federal income tax returns in the amounts of $271,431 and $1,181,668, respectively. Meyer charged $76,366 for PARTICIPANT 2 to participate in this scheme.

141.    PARTICIPANT 2 decided to participate in Meyer's charitable giving tax scheme in January 2015. Meyer used an existing LLC and illegally backdated *every document* he prepared for PARTICIPANT 2 so that PARTICIPANT 2 could claim a charitable deduction on his 2014 federal income tax return.

142.    To execute this tax scheme, on or about January 16, 2015, Meyer provided PARTICIPANT 2's financial planners with an Attorney Engagement Agreement between Meyer and PARTICIPANT 2. Meyer backdated the Attorney Engagement Agreement to December 20, 2014.

143.    In January 2015, Meyer transferred ownership interest in a preexisting LLC that Meyer had established in 2014 to PARTICIPANT 2.

144.    In or after January 2015, Meyer drafted a document in which the LLC issued membership units to PARTICIPANT 2 in consideration for PARTICIPANT 2 purportedly contributing assets to the LLC. Meyer backdated this document to December 22, 2014.

145.    Thereafter, upon information and belief, Meyer drafted a promissory note through which PARTICIPANT 2 purportedly promised to pay his Entity over $200,000, and Meyer backdated the promissory note to a date in 2014.

146.    Then, Meyer drafted an assignment agreement through which PARTICIPANT 2 purported to assign 100% of his LLC to IEF. Meyer backdated the assignment agreement to December 31, 2014.

147.    Despite executing the assignment agreement, PARTICIPANT 2 believed, based on Meyer's misrepresentations, that PARTICIPANT 2 only assigned a non-controlling LLC interest to IEF.

148.    Meyer then prepared an IRS Form 8283 for PARTICIPANT 2 to file with his 2014 federal income tax return on which Meyer listed a $176,175 charitable contribution for the purported donation to IEF. Meyer never provided PARTICIPANT 2 with an appraisal to support this deduction.

149.    The IRS did not audit PARTICIPANT 2's 2014 federal income tax return.

150.    Despite purportedly donating 100% of the LLC interest to IEF in 2014, Meyer told PARTICIPANT 2 to use that same LLC again in 2015 to execute the charitable giving tax scheme.

151.     In 2015, PARTICIPANT 2 opened a bank account in the LLC's name and deposited $1,148,000 into the account. PARTICIPANT 2 was the only person with signature authority over the LLC's bank account. PARTICIPANT 2 never gave Meyer or anyone at IEF control over the account. In fact, PARTICIPANT 2 subsequently used these funds as collateral to secure financing in a transaction unrelated to the charitable giving tax scheme.

152.     In April 2016, as shown above in paragraph 111, PARTICIPANT 2's financial planners determined that the $1,148,000 transfer to the LLC's bank account would result in a charitable deduction that was less than PARTICIPANT 2's adjusted gross income for tax year 2015, especially when they considered Meyer's standard discounts. Accordingly, the financial planners e-mailed each other stating: "[Meyer's] discount is 21.3% per appraisal. So, in order to achieve a $1,181,668 deduction with cash contributed of $1,148,000, the note would need to be $361,155."

153.     Meyer did just that. Meyer drafted a promissory note through which PARTICIPANT 2 promised to pay his LLC $361,155. Meyer backdated the promissory note to December 31, 2015. The promissory note was not secured by any collateral and charged a 3.5% interest rate on outstanding balances in 2016 and 5% on any outstanding balances thereafter.

154.     Meyer then prepared an appraisal report backdated to January 31, 2016—more than two months before PARTICIPANT 2's financial planners told Meyer that an additional promissory note was needed—in which Meyer "appraised" PARTICIPANT 2's purported gift to IEF. Meyer's appraisal matched, to the penny, the maximum charitable deduction that PARTICIPANT 2's advisors sought in the email chain above in paragraph 111, including the exact amount of the backdated, bogus promissory note.

155.     PARTICIPANT 2 did not provide Meyer with any documents to assist in the appraisal. Meyer applied his standard 10% discount for lack of control, despite stating that IEF (again) owned 100% of PARTICIPANT 2's LLC, and 13% discount for lack of marketability. Meyer provided no meaningful explanation for these discounts.

156.     Meyer then prepared an IRS Form 8283 for PARTICIPANT 2 to file with his 2015 federal income tax return on which Meyer listed a $1,181,668 charitable contribution for the purported donation to IEF. Using the IRS Form 8283, PARTICIPANT 2 claimed a maximum charitable deduction of $1,181,668—an amount equal to *exactly* 50% of PARTICIPANT 2's adjusted gross income—on his 2015 federal income tax return.

157.     The IRS audited PARTICIPANT 2's 2015 tax return and disallowed the $1,181,668 2015 charitable contribution.

158.     After the IRS commenced its audit, Meyer advised PARTICIPANT 2 to make a charitable deduction so that the transaction would have "substance," which was just another attempt by Meyer to cover up his illegal tax scheme.

### *PARTICIPANTS 3&4*

159.     PARTICIPANTS 3&4 are a married couple who reside in Tennessee. Meyer sold his charitable giving tax scheme to PARTICIPANTS 3&4 through PARTICIPANTS 3&4's financial planner. PARTICIPANTS 3&4 claimed charitable contribution deductions on their 2015 federal income tax return in the amount of $3,836,700. Meyer charged $185,000 for PARTICIPANTS 3&4 to participate in this scheme.

160.     In 2015, Meyer created an LLC for PARTICIPANTS 3&4, and they transferred $4.9 million in cash to the LLC. In October 2015, the LLC used a portion of the $4.9 million to purchase real property for a farm for $2,125,000.

161.    Meyer drafted an agreement whereby PARTICIPANTS 3&4 assigned their interest in their LLC to IEF on December 31, 2015. Meyer misrepresented to PARTICIPANTS 3&4 that they would transfer a non-controlling interest in the LLC to IEF and retain control of the LLC. The agreement Meyer drafted, however, caused PARTICIPANTS 3&4 to assign 100% of their LLC to IEF.

162.    Meyer then prepared an appraisal report dated January 31, 2016 in which Meyer "appraised" PARTICIPANTS 3&4's purported gift of LLC units to IEF at $3,836,700.

163.    Nothing changed after the purported assignment. PARTICIPANT 3 ran the farm's operations and controlled its finances.

164.    Meyer's appraisal of PARTICIPANTS 3&4's purported donation to IEF was nonsense. The appraisal did not discuss the LLC's farm or any of the risks associated with operating a farm. It stated that the LLC's only asset was $4.9 million of cash, ignoring the LLC's real property.

165.    These abject failures are not surprising because Meyer obtained no documentation from PARTICIPANTS 3&4 to complete the appraisal. Moreover, neither Meyer nor IEF had any involvement with the LLC. They did not control the bank accounts or ever step foot on the farm.

166.    Meyer used his standard 10% discount for lack of control, despite stating that IEF owned 100% of PARTICIPANTS 3&4's LLC, and 13% discount for lack of marketability. Meyer provided no meaningful explanation for these discounts.

167.    When PARTICIPANT 4 inquired about the discounts, Meyer lied to him. Meyer told PARTICIPANT 4 that the discounts were for the time value of money. Meyer did not mention the discount for lack of marketability and the discount for lack of control.

PARTICIPANT 4 accepted this explanation because Meyer did not provide PARTICIPANT 4 with a copy of the appraisal.

168.     Meyer then prepared an IRS Form 8283 for PARTICIPANTS 3&4 to file with their 2015 federal income tax return on which Meyer listed a $3,836,700 charitable contribution for the purported donation to IEF. Using the IRS Form 8283, PARTICIPANTS 3&4 claimed a charitable deduction of $3,836,700 on their 2016 federal income tax return.

169.     PARTICIPANTS 3&4 believed that they had transferred a non-controlling LLC interest to IEF. Meyer attempted to cover-up the fact that they had transferred a 100% interest by providing PARTICIPANTS 3&4 with a draft Form 1065, U.S. Return of Partnership Income, to show a partnership. The Form 1065 was never filed with the IRS.

### PARTICIPANT 5

170.     PARTICIPANT 5 is a California-based family care physician who owns approximately two-thirds of a medical practice. Meyer sold his charitable giving tax scheme to PARTICIPANT 5 through PARTICIPANT 5's financial planner. PARTICIPANT 5 claimed a charitable contribution deduction in the amount of $1,121,400 on his 2010 federal income tax return. PARTICIPANT 5 was charged $102,500 to participate in this scheme—$20,000 upfront and the balance when he received his income tax refund.

171.     In September 2011, PARTICIPANT 5 decided to participate in Meyer's charitable giving tax scheme. Meyer used an existing LLC and backdated all necessary documents so that PARTICIPANT 5 could claim a charitable deduction on his 2010 federal income tax return.

172.     To execute the scheme in 2011, Meyer used an LLC that he previously incorporated in November 2010.

173.    Meyer drafted an LLC Agreement for PARTICIPANT 5 to sign in which PARTICIPANT 5 was named the LLC's manager. Meyer backdated the LLC Agreement to November 20, 2010.

174.    Meyer then drafted a document in which the LLC issued membership units to PARTICIPANT 5 in consideration for PARTICIPANT 5 purportedly contributing assets to the LLC. Meyer backdated this document to December 13, 2010.

175.    With the assistance from two other sub-promoters, Meyer agreed to paper a transaction by which PARTICIPANT 5 would transfer to the Entity $1.4 million of bogus intellectual property ("IP") purportedly "created" by a sub-promoter.

176.    The sub-promoter who created the IP apparently forgot to backdate documents, however. In a letter dated November 1, 2011, a sub-promoter sent PARTICIPANT 5 a "Trade Secret Protection Program and 'Compilation'" (the "IP Document") describing PARTICIPANT 5's purported IP in his medical practice. The IP Document claimed value from PARTICIPANT 5's clean desk policy, photocopier placement, and a boilerplate trade secret protection agreement that PARTICIPANT 5's employees—*e.g.*, the receptionist and cleaning staff—must sign.

177.    In addition, the IP Document is replete with errors. One section describes another doctor's anesthesiology practice while another section identifies purported trade secrets associated with another doctor's dermatology practice.

178.    PARTICIPANT 5's IP Document was created solely to further Meyer's charitable giving tax scheme.

179.    Meyer drafted an assignment agreement through which PARTICIPANT 5 purported to assign 100% of his LLC to Grace Heritage. Meyer backdated the assignment agreement to December 30, 2010.

180.     Meyer then prepared an appraisal report backdated to January 31, 2011—*nearly ten months prior to the creation of the purported IP for PARTICIPANT 5*—in which Meyer "appraised" PARTICIPANT 5's purported gift to Grace Heritage at $1,121,400.

181.     Meyer's backdated appraisal does not describe or analyze the LLC's only asset—the manufactured IP. Meyer's appraisal assumed that PARTICIPANT 5's IP was worth $1.4 million. No explanation was provided. In addition, Meyer used his standard 10% discount for lack of control, despite stating that Grace Heritage owned 100% of the LLC and its assets, and an 11% discount for lack of marketability. Meyer's analysis was predicated on various index funds and investment company funds that have absolutely nothing to do with the value of a family medical doctor's purported intellectual property.

182.     Meyer then prepared an IRS Form 8283 for PARTICIPANT 5 to file with his 2010 federal income tax return on which Meyer listed a $1,121,400 charitable contribution for the purported donation to Grace Heritage. Using the IRS Form 8283, PARTICIPANT 5 claimed a charitable deduction of $1,121,400 on his 2010 federal income tax return.

183.     The IRS audited PARTICIPANT 5's 2010 tax return and disallowed the purported charitable deduction. The IRS also assessed civil fraud penalties against PARTICIPANT 5 for claiming the charitable contribution deduction.

### FINANCIAL PLANNER 1

184.     FINANCIAL PLANNER 1 is based in the Philadelphia, Pennsylvania suburbs and was introduced to Meyer and his charitable giving tax scheme through another financial planner.

185.     FINANCIAL PLANNER 1 recommended Meyer's scheme to three clients who reside in the Washington, DC metropolitan area. From 2014 - 2016, these three clients made five

purported donations to IEF. Meyer appraised these five donations as having an aggregate fair market value of $3,563,290.

186.     In 2017, FINANCIAL PLANNER 1 realized that Meyer's scheme was not what Meyer claimed it to be. FINANCIAL PLANNER 1 extricated his clients from the scheme at FINANCIAL PLANNER 1's own expense. Meyer agreed to unwind the transaction for FINANCIAL PLANNER 1's clients if: (1) Meyer received $119,000; and (2) IEF received $25,000. Put differently, Meyer and IEF agreed to transfer LLC units back to FINANCIAL PLANNER 1's clients for less than 1% of the value at which Meyer appraised them. Meyer pocketed $119,000, 376% more than IEF received.

### FINANCIAL PLANNER 2

187.     FINANCIAL PLANNER 2 is based in Ohio and was introduced to Meyer and his charitable giving tax scheme through FINANCIAL PLANNER 1.

188.     FINANCIAL PLANNER 2 relied on the false statements made to him and FINANCIAL PLANNER 1 and advised PARTICIPANT 1, PARTICIPANT 2, PARTICIPANTS 3&4, and three other clients to enter into Meyer's scheme.

189.     Meyer appraised the LLC units that PARTICIPANT 1, PARTICIPANT 2, and PARTICIPANTS 3&4 purportedly donated to one of the Bogus Charities as having an aggregate fair market value of over $5 million.

190.     In 2017, FINANCIAL PLANNER 2 realized that Meyer's scheme was not what Meyer claimed it to be. FINANCIAL PLANNER 2 advised his clients to get out of the transaction. With the assistance of counsel, FINANCIAL PLANNER 2's clients voided their transactions *ab initio*. Meyer agreed that the Bogus Charities would give back FINANCIAL PLANNER 2's clients' Entity interests for $0 so long as Meyer retained his fees.

191.    Accordingly, Meyer and the Bogus Charities agreed to transfer Entity interests that Meyer previously valued at over $5 million back to FINANCIAL PLANNER 2's clients for free.

## HARM TO THE UNITED STATES AND THE PUBLIC

192.    Since at least 1999, Meyer has promoted, operated, and organized a charitable giving tax scheme that has caused harm to the United States Treasury, to participants in the scheme, and to the public.

193.    Meyer's charitable giving tax scheme has harmed the public and the United States. Meyer's scheme harmed the public because its participants owe back taxes, interest, and, in some instances, penalties, from the disallowed charitable deductions that understated their income tax liabilities and/or overstated the refunds due.

194.    Meyer's unlawful charitable giving tax scheme has harmed the United States Treasury. In furtherance of his scheme, Meyer has performed over 600 appraisals, which were used to claim massive, unwarranted charitable contribution deductions. The examples alleged in this Complaint illustrate seven bogus charitable deductions claimed in the total amount of $9,914,468. Assuming a conservative 25% federal income tax rate, the tax harm from these examples is $2,478,617. The IRS has also identified other Entities that the Bogus Charities purportedly owned between 2002 and 2014, and using a conservative 25% federal income tax rate, the IRS estimates the tax harm from these transactions exceeds $35 million. The government will likely never recover these losses.

195.    Meyer's conduct further harmed the United States and the public by requiring the IRS to devote resources to detecting his misconduct and assessing and collecting lost tax revenue from the scheme participants.

196.     Meyer damaged the public at large by undermining public confidence in the federal tax system by flaunting the charitable donation tax deduction that Congress enacted to encourage gifts for noble and altruistic purposes—*e.g.*, for cancer research or to help disadvantaged children. Meyer encouraged noncompliance with the federal tax laws by organizing, promoting, and executing a nationwide tax shelter so that he could profit from fraudulent charitable contribution tax deductions.

### COUNT I - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7408 for Engaging in Conduct Subject to Penalty Under 26 U.S.C. § 6700

197.     The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

198.     Section 7408(a) authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6700 if injunctive relief is appropriate to prevent recurrence of that conduct or any other activity subject to penalty under the Internal Revenue Code.

199.     Section 6700 imposes a civil penalty on any person who: (1) either organizes or assists in the organization of a plan or arrangement or participates in the sale of any interest in a plan or arrangement; and (2) makes or furnishes, or causes another to make or furnish, certain statements.

200.     One such statement subject to penalty is a statement with respect to the securing of a tax benefit by reason of holding an interest in an entity or participating in a plan or arrangement that the person has reason to know is false or fraudulent as to any material matter. 26 U.S.C. § 6700(a)(2)(A).

201.     Another such statement subject to penalty is a "gross valuation overstatement as to any material matter." 26 U.S.C. § 6700(a)(2)(B). A gross valuation overstatement is "any

statement as to the value of any property or services" if the value of the property or services is directly related to the amount of any tax deduction or credit and the stated value is more than 200 percent of the correct value of the property or services. 26 U.S.C. § 6700(b)(1).

202.    Meyer's charitable giving tax scheme, which he executed through IEF, Grace Heritage and NEA, is a plan or arrangement within the meaning of 26 U.S.C. § 6700.

203.    Meyer organized, promoted, and sold the charitable giving tax scheme to hundreds of wealthy participants.

204.    In connection with the charitable giving tax scheme, Meyer made and furnished and caused IEF, Grace Heritage, and NEA to make and furnish false and/or fraudulent statements regarding the allowability of bogus charitable deductions by reason of participating in the charitable giving tax scheme.

205.    Meyer knew and had reason to know that these statements were false or fraudulent within the meaning of 26 U.S.C. § 6700(a)(2)(A). Specifically, Meyer made many false statements regarding the validity of his scheme; the tax exempt statuses of IEF, Grace Heritage, and NEA; and the propriety of the scheme participant's donations and resulting charitable contribution deductions.

206.    In connection with his charitable giving tax scheme, Meyer made or furnished gross valuation overstatements within the meaning of 26 U.S.C. § 6700(a)(2)(B). Specifically, he prepared baseless appraisals and the resulting Forms 8283 that allowed the scheme participants to claim bogus charitable deductions.

207.    If Meyer is not enjoined, he is likely to continue to promote his charitable giving tax scheme using a new bogus charity.

208.    The United States will suffer irreparable injury if Meyer is not enjoined.

209.     Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Meyer's illegal conduct and the harm it causes the United States.

210.     Meyer engaged in conduct—including but not limited to the conduct described in this Complaint—that is subject to penalty under 26 U.S.C. § 6700, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

**COUNT II - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7408 for Engaging in Conduct Subject to Penalty Under 26 U.S.C. § 6701**

211.     The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

212.     Section 7408 (a) authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6701 if injunctive relief is appropriate to prevent recurrence of that conduct or any other activity subject to penalty under the Internal Revenue Code.

213.     Section 6701 imposes a civil penalty on any person who aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, claim or other document, who knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws, and who knows that such portion (if so used) would result in an understatement of the liability for tax of another person.

214.     Meyer prepared and presented, or assisted others in preparing and presenting, documents and portions of documents that they know (or had reason to know) would be used in connection with material matters arising under the internal revenue laws, and knew that such portions (if so used) would result in understatements of the liabilities for tax of other persons.

215.     Specifically, the IRS granted Code § 501(c)(3) status to IEF, Grace Heritage, and NEA based on the Tax Exempt Status Applications that Meyer prepared. Meyer relied on these tax exempt statuses to execute his charitable giving tax scheme. Meyer prepared appraisals and Forms 8283 to facilitate the scheme participants' bogus charitable deductions. Then, when the IRS audited the scheme participants, Meyer, on behalf of the participants, sent the IRS written explanations purporting to defend the participants' claimed charitable deductions. Finally, Meyer prepared IEF and Grace Heritage's annual tax returns on IRS Form 990 to keep his scheme going. Meyer knew and had reason to know that these documents resulted in improper tax deductions, and thus understated tax liabilities, for the scheme participants.

216.     If Meyer is not enjoined, he is likely to continue to promote this abusive charitable giving tax scheme.

217.     The United States will suffer irreparable injury if Meyer is not enjoined.

218.     Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Meyer's illegal conduct and the harm it causes the United States.

219.     Meyer engaged in conduct—including but not limited to the conduct described in this Complaint—that is subject to penalty under 26 U.S.C. § 6701, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

**COUNT III - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7408 for Engaging in Conduct Subject to Penalty Under 26 U.S.C. § 6707**

220.     The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

221.    Section 7408 (a) authorizes a district court to enjoin any person from engaging in conduct subject to penalty under 26 U.S.C. § 6707 if injunctive relief is appropriate to prevent recurrence of that conduct.

222.    Section 6707 imposes a civil penalty on a "material adviser" who fails to register a "reportable transaction."

223.    A transaction with contractual protection—*e.g.*, one in which the advisor charges a contingent fee or otherwise guarantees the transaction's success—is a reportable transaction.

224.    A material advisor is a person who advises natural persons on the federal income tax consequences of a reportable transaction and receives a $50,000 fee. The material advisor must register the transaction with the IRS on Form 8918, Material Advisory Disclosure Statement.

225.    Meyer's charitable giving tax scheme is a reportable transaction with contractual protection. Meyer charges the participants a fee of 4% - 6% of the property being appraised, which is in substance a contingent fee based on the sought after charitable deduction. In addition, Meyer agreed to a fee structure with PARTICIPANT 5 whereby PARTICIPANT 5 paid Meyer and the sub-promoters $20,000 upfront and the balance only after the income tax refund was received.

226.    Meyer is a material advisor because he advises on the tax consequences of the transaction—*i.e.*, the purported charitable deduction—and earned more than $50,000 doing so.

227.    Despite being a material advisor, Meyer never registered this transaction with the IRS on Form 8918, Material Advisory Disclosure Statement.

228.    If Meyer is not enjoined, he is likely to continue to promote this abusive charitable giving tax scheme.

229.     The United States will suffer irreparable injury if Meyer is not enjoined.

230.     Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Meyer's illegal conduct and the harm it causes the United States.

231.     Meyer engaged in conduct—including but not limited to the conduct described in this Complaint—that is subject to penalty under 26 U.S.C. § 6707, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

### COUNT IV - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7408 for Engaging in Conduct that Violated his Obligations Under Circular 230

232.     The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

233.     Section 7408(a) authorizes a district court to enjoin any person from engaging in conduct that violates any requirement under regulations issued under section 330 of title 31, United States Code—*i.e.*, Circular 230—if injunctive relief is appropriate to prevent recurrence of such conduct.

234.     Circular 230 prohibits practitioners from charging contingent fees with respect to positions taken on originally filed returns. Meyer repeatedly violated this prohibition because Meyer charges the scheme participants a fee of 4% - 6% of the property being appraised, which in substance is a contingent fee based on the sought after charitable deduction. In addition, Meyer agreed to a fee structure with PARTICIPANT 5 whereby PARTICIPANT 5 paid Meyer and the sub-promoters $20,000 upfront and the balance when the income tax refund was received.

235.     Circular 230 requires a tax practitioner to base written advice on reasonable factual and legal assumptions and reasonably consider all facts and circumstances that the

practitioner knows and should know. Meyer repeatedly failed this standard because he knowingly issued written advice—tax memoranda, a tax opinion, and other written documents— that failed to reflect the reality of his transaction: that IEF, Grace Heritage, and NEA were bogus charities and that the scheme participants never made valid donations because they failed to relinquish control of their "property."

236.    Prior to June 12, 2014, Circular 230 required specific disclosures and caveats to be prominently displayed on written materials used to market tax transactions—*e.g.*, PowerPoint slides, tax opinions, emails. Meyer's written materials were required, but failed to contain the following critical disclaimer:

> The advice was not intended or written by the practitioner to be used, and that it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. The advice was written to support the promotion or marketing of the transaction(s) or matter(s) addressed by the written advice. The taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

237.    If Meyer is not enjoined, he is likely to continue to promote this abusive charitable giving tax scheme and violate his Circular 230 professional obligations.

238.    The United States will suffer irreparable injury if Meyer is not enjoined.

239.    Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Meyer's illegal conduct and the harm it causes the United States.

240.    Meyer engaged in conduct—including but not limited to the conduct described in this Complaint—that violates Circular 230, and an injunction under 26 U.S.C. § 7408 is appropriate to prevent recurrence of such conduct.

**COUNT V - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7407**
**for Engaging in Conduct Subject to Penalty Under 26 U.S.C. § 6694**

241.    The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

242.    Section 7407 authorizes a district court to enjoin a tax return preparer from, *inter alia*, engaging in conduct subject to penalty under 26 U.S.C. § 6694 if injunctive relief is appropriate to prevent recurrence of that conduct.

243.    Section 6694(a) imposes penalties on a tax return preparer who prepares a return or claim for refund that contains an understatement of a tax liability due to an unreasonable position and the return preparer knew (or reasonably should have known) of the position. Section 6694(b) imposes penalties on a tax return preparer who willfully attempts to understate a tax liability on a return or claim or who recklessly or intentionally disregards rules or regulations.

244.    A "tax return preparer" as used in Section 6694 is defined as any person who prepares for compensation, any return of tax or any claim for refund of tax *including the preparation of a substantial portion* of a return or claim for refund.

245.    A tax return preparer is both the individual who signed the tax return and the individual who did not sign the tax return (the "non-signing preparer"), but who prepared all or a substantial portion of a return and gave advice with respect to a position taken or an entry on a tax return.

246.    Over time, Meyer acted as both a signing tax return preparer and a non-signing tax return preparer in this charitable giving tax scheme. Meyer prepared tax returns for the Bogus Charities and portions of tax returns for participants for compensation. He also provided advice for positions or entries taken on federal tax returns.

247.     Meyer prepared for compensation Forms 990, Return of Organization Exempt From Income Tax, for the Bogus Charities. To the extent he was not compensated by the Bogus Charities, the scheme participants compensated him because filing the Bogus Charities' Forms 990 was necessary for the survival of his charitable giving tax scheme. Meyer signed a few Forms 990 himself and caused individuals to sign other Forms 990. The Bogus Charities often signed Powers of Attorney permitting Meyer to represent them before the IRS.

248.     Meyer also prepared the Form 8283, Noncash Charitable Contributions, for all of his charitable giving tax scheme participants. He falsely advised the participants that the bogus charitable deductions were valid, and prepared the appraisals in support thereof. Indeed, in sending Forms 8283 to scheme participants, Meyer specifically instructed: "Please find IRS Form 8283 which has been completed and signed. Please attach the Form 8283 with your [tax year] Form 1040. After you have done this, then simply file the Return. . . . Use the value of the gift on Form 8283 (page 2 Part I) as a DEDUCTION on SCHEDULE A – ITEMIZED DEDUCTION – CHARITABLE CONTRIBUTION."

249.     Meyer consistently engaged in conduct—including understating the federal tax liabilities on tax returns (or portions of tax returns) that he prepared—that is subject to penalty under 26 U.S.C. § 6694, and an injunction under 26 U.S.C. § 7407 is appropriate to prevent recurrence of such conduct.

250.     The United States will suffer irreparable injury if Meyer is not enjoined.

251.     Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop his illegal conduct and the harm it causes the United States.

**COUNT VI - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7407 for Engaging in Fraudulent and Deceptive Conduct that Substantially Interfered with the Proper Administration of the Internal Revenue Laws**

252.    The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

253.    Section 7407 authorizes a district court to enjoin any tax return preparer from, *inter alia*, engaging in fraudulent and deceptive conduct that substantially interferes with the proper administration of the Internal Revenue laws if injunctive relief is appropriate to prevent recurrence of that conduct.

254.    Meyer's charitable giving tax scheme is an affront to the nation's federal tax laws. Scheme participants made purported donations to bogus charities that Meyer controlled. Meyer sold the scheme by making false statements about his experience, his credentials, and the scheme's validity. Meyer appraised the purported donations, but the appraisals were mere window dressing intended to cover-up his scheme participants' bogus charitable deductions. Meyer prepared the tax forms necessary for the scheme participants to claim the deduction, and he helped defend the deductions during IRS audits. Finally, Meyer prepared the Bogus Charities' tax returns to keep the scheme going.

255.    Meyer used his education and knowledge of federal tax laws, tax return preparation, and federal tax procedure to promote and profit from a bogus charitable giving tax scheme that has caused at least $35 million of harm to the United States through 2014.

256.    Meyer engaged in this fraudulent and deceptive conduct since 1999. The federal tax forms and tax returns that Meyer prepared were instrumental in this prolonged malfeasance. Meyer should be enjoined from preparing federal income tax returns for compensation.

257.    The United States will suffer irreparable injury if Meyer is not enjoined.

258.    Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop his illegal conduct and the harm it causes the United States.

**COUNT VII - Injunction Against Michael L. Meyer Under 26 U.S.C. § 7402**
**for Engaging in Conduct Subject to Penalty Under 26 U.S.C. § 6695A**

259.    The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

260.    Section 7402(a) authorizes a district court to issue injunctions and to render judgments that may be necessary or appropriate for the enforcement of the internal revenue laws even when the United States may have other remedies available for enforcing those laws.

261.    Section 6695A(a) imposes a civil penalty on any person who appraises property and knows (or reasonably should have known) that the appraisal would be used in connection with a federal tax return or a claim for refund, and the claimed value of the property results in a substantial valuation misstatement or a gross valuation misstatement. A substantial valuation misstatement results when the value of any property claimed is 150% or more of the property's correct valuation (26 U.S.C. § 6662(e)), and a gross valuation misstatement results when the value of any property claimed is 200% or more of the property's correct valuation (26 U.S.C. § 6662(h)).

262.    As alleged herein, Meyer appraised the bogus charitable donations made as part of his charitable giving tax scheme. Meyer prepared appraisals despite knowing the donations were never made. Meyer backdated appraisals and prepared appraisals for fictitious assets. Additionally, the appraisals were baseless and included nonsensical, predetermined discounts for lack of control and lack of marketability. Meyer used these fraudulent appraisals to complete the scheme participants' Forms 8283 so they could claim their bogus charitable contribution

deductions. Thus, Meyer knew that his appraisals were used in connection with federal income tax returns.

263.    Meyer consistently overvalued property by at least 150%.

264.    Section 6695A penalizes conduct that interferes with the enforcement of the internal revenue laws.

265.    Meyer consistently engaged in conduct—including overvaluing appraised property by at least 150%—that is subject to penalty under 26 U.S.C. § 6695A, and an injunction under 26 U.S.C. § 7402 is appropriate to prevent recurrence of such conduct.

266.    The United States will suffer irreparable injury if Meyer is not enjoined.

267.    Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop his illegal conduct and the harm it causes the United States.

**COUNT VIII - Injunction Against Defendant Michael L. Meyer Under 26 U.S.C. § 7402 for Unlawful Interference with the Administration and Enforcement of the Internal Revenue Laws**

268.    The United States incorporates by reference the allegations contained in paragraphs 1 through 196.

269.    Section 7402(a) authorizes a district court to issue injunctions and to render judgments that may be necessary or appropriate for the enforcement of the internal revenue laws even when the United States may have other remedies available for enforcing those laws.

270.    Section 7402 manifests Congress's intent to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws. The statute has been used to enjoin interference with tax enforcement even when such interference does not violate any particular tax statute.

271.    Meyer, through the actions described above, engaged in conduct that interferes substantially with the administration and enforcement of the internal revenue laws. Meyer, through IEF, Grace Heritage, and NEA, promoted an abusive tax scheme and aided and abetted understatements of tax liabilities that have caused at least $35 million in tax harm.

272.    Meyer continues to promote his charitable giving tax scheme to current and potential participants. Participation has not slowed down.

273.    The scheme participants continue to claim bogus charitable contribution deductions as a result of the scheme.

274.    Meyer's charitable giving tax scheme has caused irreparable harm to the United States.

275.    Meyer, through bogus charities, caused and is causing substantial revenue loss to the United States Treasury, much of which is unrecoverable.

276.    Meyer previously executed his charitable giving tax scheme through the Bogus Charities. The IRS revoked the Bogus Charities' tax exempt status because of Meyer's conduct. Nonetheless, Meyer continues operating his charitable giving tax scheme, and despite the revocation of the Bogus Charities' tax exempt status, still claims that his charitable giving tax scheme constitutes valid tax planning. Nothing has deterred Meyer from promoting this abusive tax scheme, aiding and abetting understatements of tax liabilities, and otherwise interfering with the enforcement of the internal revenue laws.

277.    If not enjoined, Meyer will likely continue to engage in conduct subject to penalty under 26 U.S.C. §§ 6700, 6701, 6707, 6695A, 6694, and conduct that interferes with the enforcement of the internal revenue laws.

278.    Enjoining Meyer is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop his illegal conduct and the harm it causes the United States.

## Relief Sought

WHEREFORE, the United States of America prays for the following relief:

A.  That the Court find that defendant Michael L. Meyer continually and repeatedly engaged in conduct subject to penalty under 26 U.S.C. §§ 6694, 6695A, 6701, 6700, and 6707, and that injunctive relief is appropriate under 26 U.S.C. §§ 7402, 7407, and 7408 to bar defendant Michael L. Meyer from providing federal tax advice for compensation, acting as a tax return preparer, or performing appraisals in connection with any federal tax matter;

B.  That the Court find that defendant Michael L. Meyer substantially interfered with the enforcement and administration of the internal revenue laws, and that injunctive relief against him is appropriate to prevent further misconduct pursuant to 26 U.S.C. §§ 7402(a), 7407(b)(2), and 7408(b)(2);

C.  That the Court permanently enjoin defendant Michael L. Meyer and his representatives, agents, servants, employees, and anyone in active concert or participation with him, from directly or indirectly:

   1.  Making or furnishing or causing another person to make or furnish a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit, or otherwise providing tax advice, in exchange for compensation;

2.  Preparing (or assisting others in preparing) appraisals in connection with any federal tax matter;

3.  Representing anyone other than himself before the IRS;

4.  Acting as federal tax return preparers, or filing, assisting in, or directing the preparation or filing of federal tax returns, amended returns, or other related documents or forms for any person or entity other than his own tax returns;

5.  Filing, providing forms for, or otherwise aiding and abetting the filing of IRS Forms 990, 1040, 1040X, 8283, or any other IRS forms containing false or fabricated information;

6.  Owning, managing, controlling, working for, profiting from, or volunteering for any business that receives compensation for providing federal tax advice, preparing federal tax returns and tax forms, preparing appraisals or similar documents in connection with federal tax returns, or representing taxpayers—whether individuals, partnerships, corporations, trusts, or estates—before the IRS;

7.  Organizing or assisting in the organization of a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement concerning charitable contribution deductions;

8.  Seeking permission or authorization (or helping or soliciting others to seek permission or authorization) to file tax returns with an IRS Preparer Tax Identification Number ("PTIN") and/or IRS Electronic Filing Identification Number ("EFIN"), or through any other IRS service or program by which one prepares or files tax returns;

9. Using, maintaining, renewing, obtaining, transferring, selling, or assigning any PTIN(s) or EFIN(s);

10. Engaging in any other conduct that is subject to penalty under the Internal Revenue Code or that interferes with the proper administration and enforcement of the internal revenue laws;

D. That the Court, pursuant to 26 U.S.C. § 7402, enter an order enjoining defendant Michael L. Meyer from being an officer, director, or employee for any tax-exempt entity, or from otherwise receiving compensation, whether cash or in-kind, from any tax-exempt entity;

E. That the Court, pursuant to 26 U.S.C. §§ 7402, 7407, and 7408, enter an order requiring defendant Michael L. Meyer, within 30 days of receiving the Court's order, to contact by U.S. mail and, if an e-mail address is known, by e-mail, all of his charitable giving tax scheme participants, who entered into the scheme after January 1, 2010, enclosing a copy of the executed injunction. The injunction should require that: (i) other than the executed injunction, no additional materials may be included in the notification to the scheme participants unless approved by the United States or the Court; and (ii) defendant Michael L. Meyer shall file with the Court, within 10 days thereafter, a sworn certificate stating that he has complied with this requirement;

F. That the Court, pursuant to 26 U.S.C. § 7402, enter an order requiring defendant Michael L. Meyer and any his nominees to disgorge to the United States the proceeds (the amount of which is to be determined by the Court) that they received (in the form of fees) from the promotion of Michael L. Meyer's charitable giving tax scheme;

G.  That the Court, pursuant to 26 U.S.C. §§ 7402, 7407, and 7408, order defendant

Michael L. Meyer to provide to the United States within 30 days of its order a list of

the names and addresses of all individuals and entities that participated in his

charitable giving tax scheme since January 1, 2010;

H.  That this Court allow the government full post-judgment discovery to monitor

Meyer's compliance with the injunction;

I.  That the Court retain jurisdiction over this action to enforce any permanent injunction

against defendant Michael L. Meyer; and

J.  That this Court grant the United States such additional relief as the Court deems just

and appropriate.

Dated: April 3, 2018                      Respectfully submitted,

                                          BENJAMIN G. GREENBERG
                                          United States Attorney

                                          RICHARD E. ZUCKERMAN
                                          Principal Deputy Assistant Attorney General

                                          */s James F. Bresnahan II*
                                          JAMES F. BRESNAHAN II
                                          Florida Special Bar #: A5502407
                                          CASEY S. SMITH
                                          Florida Special Bar #: A5502312
                                          Trial Attorneys, Tax Division
                                          U.S. Department of Justice
                                          P.O. Box 7238
                                          Washington, D.C. 20044
                                          Telephone: 202-616-9067 (Bresnahan)
                                          Telephone: 202-307-0715 (Smith)
                                          Fax: 202-514-6770
                                          James.F.Bresnahan@usdoj.gov
                                          Casey.S.Smith@usdoj.gov